UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

D.A.B. AND M.B., INDIVIDUALLY AND ON
BEHALF OF D.B.,

                    Plaintiffs,

      - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION,

               Defendant.
————————————————————————————————

12 Civ. 4325 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiffs, D.A.B. and M.B., bring this action on behalf of their son, D.B., pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 et seq., and New York Education Law § 4400 et seq., against the New York City Department of Education ("the Department"). The plaintiffs challenge the decision of the State Review Officer ("SRO") denying their claim for payment of D.B.'s tuition for the McCarton Center, a private center at which D.B. was unilaterally placed for the 2010-2011 school year. The SRO's decision reversed the decision of an Impartial Hearing Officer ("IHO"). The parties have cross-moved for

summary judgment on the plaintiffs' IDEA claim.[1]  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. §§ 1415(i)(2)(A) and (3)(A).

For the reasons explained below, the plaintiffs' motion for summary judgment on the IDEA claim is **denied** and the defendant's motion for summary judgment on the IDEA claim is **granted**.

## I.

"Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'"  Gagliardo v. Arlington Cent. Sch. Dist. ("Gagliardo II"), 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); see also Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998).  A free appropriate public education ("FAPE") must provide "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'"  Walczak, 142 F.3d at 122 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982) (citation and internal quotation marks omitted)).  Because the

---

[1] While all parties sought summary judgment on all claims, the parties only addressed the standards to be applied to a claim under IDEA, and therefore summary judgment could not be granted with respect to the remaining claims at this time.

IDEA expresses a "strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs." Id. (internal citation omitted); see also D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ., No. 12 Civ. 1394, 2013 WL 1234864, at *1 (S.D.N.Y. March 26, 2013).

"To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012) (citing 20 U.S.C. § 1414(d); Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system)), cert. denied, No. 12-1210, 2013 WL 1418840, at *1 (June 10, 2013).  The IDEA requires that an IEP be "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207.  In New York, the responsibility for developing an appropriate IEP for a child is assigned to a local Committee on Special Education ("CSE"). Walczak, 142 F.3d at 123.  "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special

3

education teacher, a school board representative, a parent
representative, and others." <u>R.E.</u>, 694 F.3d at 175 (citing N.Y.
Educ. Law § 4402(1)(b)(1)(a)).  "The CSE must examine the
student's level of achievement and specific needs and determine
an appropriate educational program." <u>Id.</u> (citing <u>Gagliardo II</u>,
489 F.3d at 107–08).

Parents in New York who wish to challenge their child's IEP
as insufficient under the IDEA may request an impartial due
process hearing before an IHO appointed by the local board of
education. <u>Walczak</u>, 142 F.3d at 123 (citing 20 U.S.C. § 1415(f);
N.Y. Educ. Law § 4404(1)).  A party may appeal the decision of
the IHO to an SRO, and the SRO's decision may be challenged in
either state or federal court.  <u>Id.</u> (citing 20 U.S.C. § 1415(g),
1415(i)(2)(A) and N.Y. Educ. Law § 4404(2)).  In addition, if a
school district fails to provide a FAPE to a child with
disabilities, the child's parents may, at their own financial
risk, remove the child from the improper placement, enroll the
child in an appropriate private school, and retroactively seek
reimbursement for the cost of private school from the state.
<u>See Sch. Comm. of Burlington v. Dep't of Educ.</u>, 471 U.S. 359,
370 (1985); <u>see also</u> <u>D.C.</u>, 2013 WL 1234864, at *2.

Under the IDEA, a district court must conduct an
independent review of the administrative record, along with any

4

additional evidence presented by the parties, and must determine
by a preponderance of the evidence whether the IDEA's provisions
have been met.[2]  Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d
377, 380-81 (2d Cir. 2003); see also Gagliardo II, 489 F.3d at
112.  This independent review, however, is "by no means an
invitation to the courts to substitute their own notions of
sound educational policy for those of the school authorities
which they review."  Rowley, 458 U.S. at 206.

     The Second Circuit Court of Appeals has explained that "the
standard for reviewing administrative determinations 'requires a
more critical appraisal of the agency determination than clear-
error review . . . but . . . nevertheless[] falls well short of
complete de novo review. . . . [I]n the course of th[is]
oversight, the persuasiveness of a particular administrative
finding, or the lack thereof, is likely to tell the tale.'"
M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012)

---

[2] The Second Circuit Court of Appeals has noted that, "Summary
judgment in the IDEA context . . . is only a pragmatic
procedural mechanism for reviewing administrative decisions."
M.W. ex rel. S.W. v. New York City Dep't of Educ., -- F. 3d --,
2013 WL 3868594, at *4 (2d Cir. 2013) (internal citation and
quotation marks omitted).  But "[t]he inquiry . . . is not
directed to discerning whether there are disputed issues of
fact, but rather, whether the administrative record, together
with any additional evidence, establishes that there has been
compliance with IDEA's processes and that the child's
educational needs have been appropriately addressed."  Wall v.
Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 508 (E.D.N.Y.
1996); see also D.C., 2013 WL 1234864, at *2 n.2.

(quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086-87
(1st Cir. 1993)).  "[T]he district court's analysis will hinge
on the kinds of considerations that normally determine whether
any particular judgment is persuasive, for example whether the
decision being reviewed is well-reasoned, and whether it was
based on substantially greater familiarity with the evidence and
the witnesses than the reviewing court.  But the district
court's determination of the persuasiveness of an administrative
finding must also be colored by an accute [sic] awareness of
institutional competence and role."  Id.; see M.W., 2013 WL
3868594, at *4.

    The Court of Appeals has also explained that "federal
courts reviewing administrative decisions must give 'due weight'
to these proceedings, mindful that the judiciary generally
'lack[s] the specialized knowledge and experience necessary to
resolve persistent and difficult questions of educational
policy.'"  Gagliardo II, 489 F.3d at 113 (quoting Rowley, 458
U.S. at 206, 208); see also Cerra v. Pawling Cent. Sch. Dist.,
427 F.3d 186, 191 (2d Cir. 2005).  Deference to the decision in
the administrative record is particularly appropriate when an
administrative officer's review has been thorough and careful,
and when the court's decision is based solely on the
administrative record.  See Walczak, 142 F.3d at 129; Frank G.

6

v. Bd. of Educ., 459 F.3d 356, 367 (2d Cir. 2006).  When, as in
this case, "an IHO and SRO reach conflicting conclusions, we
defer to the final decision of the state authorities, that is,
the SRO's decision."  M.W., 2013 WL 3868594, at *4 (internal
citation and quotation marks omitted).  However, the amount of
deference to an SRO's determination "depends on the quality of
that opinion."  Id. (internal citation and quotation marks
omitted).


## II.

The following facts and procedural background are taken
from the administrative record and the submissions of the
parties.  The facts are undisputed unless otherwise noted.


### A.  IEP AND PLACEMENT

D.A.B. and M.B. are the parents of D.B., a child classified
with autism who has also been diagnosed with apraxia of speech.[3]
(SRO Op. at 2; Tr. 780.)  D.B. was born in July 2004, and was

---

[3] Apraxia of speech is a disorder characterized by severe motor
planning difficulties, by which a person has trouble speaking
correctly.  (Tr. 360, 485, 508-09.)  "Tr." refers to the
transcript of the hearing before the IHO.

approximately six years old at the time of the 2010-2011 school year at issue in this case.  (IHO Op. at 4; Ex. 1 ("IEP") at 1.)[4]

Prior to the 2009-2010 school year, D.B. received early intervention services through the Department of Health and preschool special education services under the auspices of the Department of Education's Committee on Preschool Education ("CPSE").  (IHO Op. at 4.)  These services included twenty-five hours of individual instruction from a special education itinerant teacher and daily speech and language services.  (IHO Op. at 4.)  During the 2009-2010 school year, D.B. attended the McCarton Center, a non-public center in New York City.  (SRO Op. at 3.)  At the McCarton Center, D.B. received individual speech and language therapy six times per week for forty-five minutes per session, individual occupational therapy five times per week for forty-five minutes per session, and twenty hours per week of individual ABA[5] therapy.  (IHO Op. at 5-6; Ex. 13 at 1.)

The Department convened a CSE meeting to develop an IEP for D.B. for the 2010-2011 school year over two days, May 4-5, 2010.

_____

[4] Exhibits with numbers refer to the defendant's exhibit appendix and exhibits with letters refer to the plaintiffs' exhibit appendix each of which was submitted to the Office of State Review. Exhibits with roman numerals refer to the IHO's exhibits that were submitted to the Office of State Review.  Neither party challenges the exhibits.

[5] "ABA," short for the Applied Behavior Analysis method, uses rewards and punishments to encourage and discourage certain behaviors.  See D.C., 2013 WL 1234864, at *6 n.15.

(IHO Op. at 4.)  Present at the May 4 meeting were D.B.'s
mother, D.A.B.; Maria Visco, D.B.'s teacher and the Director of
ABA services at McCarton; Jamie Aranoff, D.B.'s speech and
language pathologist from the McCarton Center; Maria Bizzarro,
D.B.'s occupational therapist from the McCarton Center; Carol
Schaechter, a special education teacher; Kathy Kaufman, a school
psychologist and the district representative; and a parent
representative.  (IEP at 2.)  Aranoff, Visco, Bizzaro, and
D.A.B. were present by telephone.  (IEP at 2.)  Present at the
May 5 meeting were D.B.'s mother, Kathy Kaufman, Carol
Schaechter, Maria Visco, and a parent representative.  (IEP at
3.)  Ms. Visco and D.A.B. were present by telephone.  (IEP at
3.)

     The CSE was provided with several sources of information
with which to formulate D.B.'s IEP.  Two of the sources, a
psychological evaluation by Dr. David Salsberg (Ex. 4), and an
educational progress report (Ex. 12), were from February 2009
and March 2009 respectively, more than a year before the CSE
meeting.

The Salsberg evaluation explained that D.B. required a structured and small learning environment:

> It is imperative that [D.B.] be placed immediately in a small, structured ABA classroom setting, as part of a small, therapeutic school, that will provide him with 1:1 attention to ensure his attention and participation. . . . He requires a highly specialized 1:1 ABA program for children on the autistic spectrum. [D.B.]requires 1:1 attention within his class by a special educator throughout the day to ensure his attention and participation. . . . [D.B.]needs intense 1:1 support with language/communication skill development . . . . [D.B.]needs one-to-one support by someone experienced in ABA, as part of a special education team emphasizing functional communication and behavioral interventions.

(Ex. 4.)  The 2009 educational progress report similarly recommended "an intensive one to one ABA center based program." (Ex. 12.)[6]

In addition to the reports from 2009, the staff at the McCarton Center submitted several reports from March and April 2010 based on D.B.'s performance during the 2009-2010 school year: a comprehensive speech and language evaluation by Jamie Aranoff and Meredith Weprin, D.B.'s speech and language pathologists (Ex. 13); an ABA programming and progress report by Maria Visco (Ex. D); and an occupational therapy progress note by Maria Bizzarro (Ex. 10).

---

[6] The parent has not challenged the failure of the IEP to specify the use of the ABA methodology.

The 2010 reports from the staff at the McCarton Center each
indicated that D.B. had made progress over the 2009-2010 school
year.  Ms. Visco's April 2010 progress report concluded that
D.B. had made progress but still required a small and structured
environment:

> [D.B.] does very well in highly structured situations.
> He still needs many practice trials to acquire new
> skills, but has been able to sit and attend to his
> instructor at the table for longer periods as the year
> has progressed.   He has acquired skills across
> domains, but continues to have language deficits and
> problem behavior.   He needs a program that will
> provide structure and repetition, that will address
> his social and language deficits intensively, and that
> will consistently intervene on problem behavior.

(Ex. D at 3.)  Ms. Bizzarro's occupational therapy progress note
concluded that D.B. "has made improvements in all areas" but
"continue[s] to demonstrate significant deficits" and therefore
sensory gym based occupational therapy "continues to be
indicated five times weekly for 45 minutes . . . ."  (Ex. 10 at
5.)  Ms. Aranoff's speech and language evaluation explained that
D.B. continued to make progress but still required
individualized speech and language support.  Aranoff recommended
that D.B. receive individualized speech and language therapy six
times per week for forty-five minutes.  (Ex. 13 at 6.)[7]

---

[7] The report also recommended that D.B. focus on using a high
tech augmentative communication device twice a week for forty-
five minutes.  However, the parent has not challenged the

In addition, Kathy Kaufman, a school psychologist, observed D.B. for approximately an hour and submitted her report on her observation to the CSE.  (Ex. 9.)  The report made no recommendation.

The resulting IEP classified D.B. as autistic and recommended a twelve-month school year.  (IEP at 1.)  Because a twelve-month school year begins over the summer, the IEP called for D.B. to begin his new program on July 1, 2010.  (IEP at 3.)  The CSE concluded that D.B. should be placed in a specialized class in a specialized school with a student/teacher/paraprofessional ratio of 6:1:1.  (IEP at 1-2.)  The IEP also recommended that because of D.B.'s behavioral issues, D.B. should be provided with a full time 1:1 behavior management paraprofessional ("BMP").  (IEP at 2, 7, 8, 9.)  The CSE considered and rejected programs with ratios of 12:1:1 and 6:1:1 without a BMP because it believed they were insufficiently supportive and that D.B. would benefit from a BMP.  (IEP at 8.)

The IEP provided that D.B. had many academic management needs, among them a "highly structured, predictable learning environment," and a "consistent positive reinforcement schedule."  (IEP at 3.)  In the "Social/Emotional Performance"

----

failure of the IEP or the placement to include this provision, and therefore it will not be addressed further.  (Ex. 13 at 6.)

category, the IEP noted that according to D.B.'s teacher, D.B. "had improved a great deal since he began at the McCarton Center" but that his "attention continue[s] to be variable and this interferes with his ability to follow directions." (IEP at 4.) The IEP concludes that D.B.'s "[b]ehavior seriously interfere[s] with instruction and require[s] additional adult supervision." (IEP at 4.) In the "Health and Physical Development" category, the IEP noted that according to his occupational therapist, although when D.B. had begun the 2009-2010 school year he "presented with severe dyspraxia" and "was unable to run, play catch, imitate writing straight lines, attend to scribbling, or hold a pencil or crayon with a tripod grasp," he had made "tremendous progress." (IEP at 5.) After chronicling the many facets of his progress, the section concluded that "[o]verall, [D.B.] has an increased understanding of what is expected of him and he has an increased interest in the activities presented." (IEP at 4.)

The IEP also contained 17 annual goals and 96 short-term objectives for a number of academic and non-academic focus areas.[8] (SRO Op. at 9.) In general, the annual goals were broadly worded, such as "[D.B.] will improve reading skills," or

---

[8] The IEP contains 16 pages identifying annual goals; however, the parties agree that there were in fact 17 annual goals because one page of the IEP included two such goals.

"[D.B.] will improve math skills."  (IEP at 6.1-6.2.)  Beneath each annual goal there were corresponding short-term objectives that were more detailed.  Illustratively, one of six short-term objectives for D.B.'s reading skills provided that "[D.B.] will match at least 25 words to the co[r]responding pic[t]ures  and vice versa with 80% accuracy," and one of two short-term objectives for D.B.'s math skills provided that "[D.B.] will match numbers to quantity and quantity to number for #1 to #10 with 80% accuracy."  (IEP at 6.1-6.2.)  The IEP provided that for each set of annual goals and short-term objectives there would be three progress reports per year using a coding system included on each page.  (IEP at 6.1-6.16.)  Although the coding system was included on each page, the grid to fill the coding system into the IEP was left blank.  (IEP at 6.1-6.16.)

The IEP also included recommendations for all of the related services suggested by D.B.'s teachers at the McCarton Center.  The IEP recommended that D.B. be provided 1:1 occupational therapy five times per week for forty-five minutes (IEP at 9.2).  The IEP recommended that D.B. receive 1:1 speech therapy five times per week for forty-five minutes and once a week for thirty minutes, as well as 2:1 speech therapy once a week for thirty minutes.  (IEP at 9.1).  The IEP also recommended that D.B. receive 1:1 counseling twice each week for

14

thirty minutes and physical therapy twice each week for thirty
minutes.  (IEP at 9.1-9.2.)

Because of D.B.'s behavioral issues, the IEP included a
Behavior Intervention Plan ("BIP").  The BIP explained that D.B.
engaged in scratching, biting, and other obstructive behaviors
and described strategies for attempting to change those
behaviors.  (IEP at 10.)[9]  As support to change these behaviors,
the IEP recommended a small class setting, collaboration between
the home and the school, related services, and assigned a 1:1
full time BMP to help D.B.  (IEP at 10.)

On June 15, 2010, D.B.'s parents notified the CSE of their
intention to place D.B. unilaterally at the McCarton Center.
(Ex. C.)[10]  On June 16, 2010, the Department mailed D.B.'s
parents a final notice of recommendation ("FNR") offering D.B. a
classroom placement at P811M @ P149M ("P811M") that allegedly
provided the services listed in the IEP.  (Ex. 3.)  The FNR
stated that "[i]f we do not hear from you by **June 30, 2010**, the

---

[9] The BIP appears immediately after the page 9 recommendations in
the IEP.
[10] The letter focused on the fact that in 2009, D.B. had not
attended a proposed placement because he had not received his
required vaccinations.  Because D.B. still had not received his
vaccinations in 2010, the letter urged that D.B. would remain at
the McCarton Center.  As discussed below, the vaccination issue
is not before the Court.

recommended services will be put into effect for the 2010-2011 school year." (Ex. 3.)

Notwithstanding the parents' June 15 letter, after receipt of the FNR, D.A.B. visited P811M with D.B.'s former speech and language therapist, Sharna McMicken. (Tr. 345-50.) D.A.B. later testified at the due process hearing that based on her visit to the school, she believed that P811M was an inappropriate placement for D.B. (Tr. 870.) On June 28, 2010, D.A.B. wrote a letter to the CSE explaining that she was rejecting P811M as the placement for her son because he required one-on-one attention, the "range of functioning was extremely varied," and a paraprofessional for behavioral issues was "indicative that this was not a program for [D.B.]." (Ex. B.) The letter also suggested that D.A.B. would consider a different program that provided what D.B. needed and would visit another site if one was suggested. (Ex. B.)[11] The mother represents that the Department did not respond to her letter.

On September 16, 2010, D.A.B. filed a due process complaint notice requesting an impartial hearing and seeking reimbursement

---

[11] In the letter to the CSE, D.A.B. explained that she was also told by the principal of P811M that D.B. would require vaccinations in order to attend the school. (Ex. B.) The plaintiffs never raised the issue of vaccinations before the SRO and have not argued that the issue of vaccinations is a basis to reverse the SRO's decision. (Ex. B; Hr'g Tr. 21, 23, July 1, 2013.) Therefore, the issue is irrelevant for this opinion.

for the student's tuition at the McCarton Center for the 12-month 2010-2011 school year.  (Ex. I at 6.)

The due process complaint alleged several deficiencies with the IEP: (1) the proposed 6:1:1 program was not reasonably calculated to benefit D.B. because he required 1:1 instruction; (2) the CSE did not rely on necessary evaluations to gauge properly D.B.'s skill levels; (3) the annual goals and short-term objectives in the IEP were inadequate; (4) the CSE did not conduct a functional behavioral analysis ("FBA") before creating a BIP for D.B.; and (5) the BIP was inadequate.  (Ex. I at 1-6.) On September 24, 2010, the Department responded to the due process complaint.  (See Ex. II.)

## B. DUE PROCESS HEARINGS

An impartial hearing was convened over seven nonconsecutive days from March 2011 to August 2011.  (See IHO Op. at 3.)  At the hearing, there was testimony with respect to, among other things, the CSE meeting, the 6:1:1 class ratio, and the adequacy of the annual goals and short-term objectives.

Several of the witnesses who testified at the due process hearing were also present at the CSE meeting.  Ms. Kaufman, a school psychologist who worked for the Department and led the CSE meeting, testified that D.B.'s behavioral issues could be

17

addressed adequately by a 6:1:1 classroom with an additional
dedicated BMP.  (Tr. 274.)  She explained that prior to the CSE
meeting, the CSE read all of the reports provided to it (Tr.
266-67), and that the CSE meeting took two days because the CSE
went through each of the reports submitted and spoke with each
educational provider.  (Tr. 260, 266-67.)

Ms. Kaufman explained that the CSE did not consider a
program more restrictive than a 6:1:1 class with a one-on-one
BMP for D.B. because "[i]t wouldn't have been appropriate" and
did not consider the McCarton Center because it is a "private
school" and the CSE "didn't feel that he needed a private
school.  [The CSE] felt that his needs could be met in a public
school.  And [the CSE] felt that recommendation of having six
other students in his class would be beneficial to him."  (Tr.
306-07.)  Ms. Kaufman indicated that the CSE had decided a 6:1:1
was appropriate for D.B. even though D.B.'s mother, teachers,
and Doctor Salsberg's report indicated that he required 1:1
support.  (Tr. 306-07.)[12]

---

[12] As plaintiffs' counsel acknowledged in a letter to the Court
after oral argument on the present motions, these references in
questions to Ms. Kaufman by the plaintiffs' counsel are the only
references in the testimony that anyone present at the CSE other
than D.A.B. objected to the 6:1:1 program.  (Letter from Jesse
Cole Cutler, July 3, 2013.)  The exact testimony was as follows:

With respect to the goals in the IEP, Ms. Kaufman explained that the CSE asked each provider working with the student for input on the student goals for the 2010-2011 school year. (Tr. 277.)  She testified that methods of measurement were not included in the IEP because the CSE doesn't "dictate methodology.  The teachers or therapists working with the students are professionals.  And [the CSE felt] that since they

---

Counsel: Why didn't you consider anything more restricted?

Ms. Kaufman: It wouldn't have been appropriate to consider it.

Counsel: Even though Dylan's mother indicated that he can't function in a 6:1:1 setting?

Ms. Kaufman: Yes. - - .

Counsel: And even though his teachers indicated that he cannot function in a 1:1 - - sorry, in a 6:1:1 setting?

Ms. Kaufman: Correct.

Counsel: Did you consider recommending McCarton Center?

Ms. Kaufman: No, I did not.

Counsel: And why was that?

Ms. Kaufman: McCarton is a private school.  We didn't feel that he needed a private school.  We felt that his needs could be met in a public school.  And we felt that recommendation of having six other students in his class would be beneficial to him.

(Tr. 306-07.)

19

are working on certain skills with the student, it is determined by them as to how they will measure the student's ability to master that skill." (Tr. 278.)

Ms. Visco, the Director of ABA services at McCarton, testified at the due process hearing that she worked with D.B. twice a week for thirty to forty-five minutes over the 2009-2010 school year. (Tr. 380-81.) She testified that D.B. had a 1:1 ratio at the McCarton Center and that she believed that it was "appropriate" and "necessary" for D.B. "in terms of both skill acquisition and for problem behavior." (Tr. 396.) She elaborated that D.B. needed 1:1 because "it's just a safety concern with him in terms of . . . keeping himself safe, keeping the other kids safe, keeping the therapist safe. He really needs somebody with him constantly." (Tr. 396.) She explained that at the McCarton Center, D.B. would be in a classroom with up to four other students; however each student would have their own one-on-one instruction. (Tr. 397.) Ms. Visco also testified that her contribution to the CSE meeting was to recount "each of the goals [she] had submitted," "[D.B.'s] goals for the previous year and how he had progressed with them," and "[D.B.'s] problem behavior and how we were intervening [at McCarton]." (Tr. 422.) She also testified that she was not on the phone for the full CSE meeting or when the CSE recommended

20

the 6:1:1 program.  (Tr. 420-21.)  Although Ms. Visco testified
that she believed 1:1 instruction was necessary and appropriate
for D.B., she did not testify that she had informed the CSE that
she believed that a 6:1:1 program would be inappropriate for
D.B.

Jamie Aranoff, D.B.'s speech pathologist at the McCarton
Center, testified that her participation in the CSE meeting was
limited to recommending the goals that she had written for D.B.
and submitted to the CSE (Tr. 695.)  Aranoff did not testify
that she believed D.B. required 1:1 instruction or that she had
told the CSE D.B. required such instruction.  Similarly, Maria
Bizzarro, D.B.'s occupational therapist at McCarton, testified
that she had recommended to the CSE that D.B. receive
occupational therapy five times each week for forty-five minutes
(Tr. 735), but did not testify that she told the CSE that D.B.
required full time 1:1 instruction.

Finally, D.B.'s mother testified that she did not believe a
6:1:1 classroom was appropriate for D.B. because "none of the
professionals that [she had] spoken to in the last couple of
years felt that [D.B.] could make it in a 6:1:1 anywhere."  (Tr.
848.)  Unlike Ms. Visco, Ms. Aranoff, or Ms. Bizzarro, D.B.'s
mother testified that she told the CSE that she did not believe
the 6:1:1 program was appropriate.  (Tr. 849, 870, 937-39.)

21

In addition to those witnesses who had been present at the CSE, there were several witnesses who testified before the IHO but did not participate in the CSE and did not submit reports to the CSE. Sharna McMicken, D.B.'s speech pathologist from 2007 to 2009, gave her opinion that D.B. could not function in a 6:1:1 classroom environment. However, she had not taught D.B. since before the 2009-2010 school year. (Tr. 343-48.) Dr. Oratio, a psychologist who evaluated D.B. in the fall of 2010, and Dr. Blaustein, D.B.'s speech pathologist as of August 2010, also testified before the IHO. (Tr. 484, 531, 619.)

Moreover, several exhibits were introduced at the due process hearing that were not before the CSE because they were created after the CSE meeting was held: two BIPs from August 2010 and March 2011, an April 2011 Comprehensive Speech and Language Evaluation, a Progress Report and an Occupational Therapy Progress Note from May 2011, and a psychological re-evaluation by Dr. Oratio and Dr. Salsberg dated October 2010. These exhibits were never before the CSE and therefore did not factor into the IEP for D.B.

On December 1, 2011, the IHO issued his Findings of Fact and Decision. (See IHO Op.) The IHO held that the IEP was inappropriate and that the Department had failed to offer D.B. a FAPE for the 2010-2011 school year.

The IHO held that the annual goals in the IEP were
inappropriate:

> I find that the annual goals contained in
> the . . . IEP are inappropriate as they failed to
> include evaluative criteria, evaluation procedures and
> schedules to be used to measure the student's progress
> toward meeting the annual goals in those areas.  The
> annual goals are vaguely worded (e.g., the student
> "will improve reading skills," the student "will
> improve math skills," etc.) and fail to identify how
> well and over what period of time the student must
> perform a skill in order to consider it met[.]

(IHO Op. at 13.)  The IHO held "to the extent that deficits
identified in the IEP goals may be deemed procedural, I find
that these procedural errors impeded the student's right to a
FAPE, significantly impeded the parent's opportunity to
participate in the decision making process regarding the
provision of a FAPE to the student, and caused a deprivation of
educational benefits."  (Tr. 13.)

The IHO also concluded that the 6:1:1 program was not
"reasonably calculated to confer benefit on the student because
it would not have provided the student with sufficient
personalized instruction to permit him to benefit educationally
from that instruction."  (Tr. 15.)  The IHO's decision that a
6:1:1 was inappropriate relied upon a few pieces of evidence:
(1) the 2009 report of Dr. Salsberg (Ex. 4); (2) the testimony
by Ms. Visco that the student needed one-to-one to address "both

23

skill acquisition and for problem behavior" (Tr. 396); (3) the testimony by Dr. Blaustein and Dr. Oratio; and (4) the testimony by Ms. Aranoff that the one-to-one ratio was appropriate for D.B.'s speech and language sessions (Tr. 644). (See IHO Op. at 15.)[13]

The IHO held that the McCarton Center was an appropriate placement and that the equities favored reimbursement and ordered full reimbursement for the tuition and costs associated with the student's unilateral placement at the McCarton Center for the 2010-2011 school year. (Tr. 16-21.)

The Department appealed the decision of the IHO to the SRO and argued that the IHO's decision was incorrect with respect to both the annual goals and the adequacy of the 6:1:1 program. The SRO reversed the decision of the IHO.

The SRO held that contrary to the decision of the IHO, the annual goals and short-term objectives were "detailed,

---

[13] The IHO also rejected two additional arguments that the parents did not appeal to the SRO and are therefore waived. The IHO rejected the parents' argument that the CSE had not considered all of the evaluations and held that "based on the credible testimony of Ms. Kathy Kaufman, I find that the CSE properly relied on the evaluations made available to it in assessing the student's then-current skill levels." (IHO Op. at 12.) The IHO also rejected the parents' argument that the BIP was inadequate or that the CSE had committed an error by not formulating an FBA. (IHO Op. at 14.) Because the plaintiff did not appeal those findings to the SRO, they were waived and will not be addressed further. (See SRO Op. at 8.)

measurable, and designed to meet the student's needs." (SRO Op.
at 8.)  The SRO explained that although the annual goals were
"vaguely worded," and "lacked specificity and measurability,"
because all of the annual goals contained "specific short-term
objectives related to the student's needs from which the
student's progress could be measured," the deficiencies in the
annual goals did not rise to the level of a denial of a FAPE
(SRO Op. 9.)  Moreover, the SRO held that contrary to the IHO's
finding that the annual goals were deficient because they lacked
evaluative criteria, evaluation procedures, and schedules to be
used to measure the student's progress, because D.B.'s teachers
would determine the method of measurement three times per school
year, the failure to specify a specific method of measurement in
the IEP did not deny D.B. a FAPE. (SRO Op. at 10.)

The SRO also concluded that the 6:1:1 program was an
appropriate placement program for D.B.  The SRO chronicled the
testimony of Ms. Kaufman that a 6:1:1 was appropriate for D.B.,
the other information before the CSE—including the 2009
evaluation, and the additional related services and
accommodation recommendations in the IEP.  (IHO Op. at 10-12.)
The SRO concluded that "the CSE's recommendation to place the
student in a [6:1:1] special class was tailored to address the

student's education needs and was designed to offer the student a FAPE for the 2010-2011 school year. (SRO Op. at 12.)

The SRO explained that the 6:1:1, combined with the 1:1 BPM, was appropriately designed to address D.B.'s academic and social/emotional needs. (SRO Op. at 12.) The SRO relied on Ms. Kaufman's testimony that a more restrictive setting than a 6:1:1 classroom would not have been appropriate for D.B. (SRO Op. at 13.) The SRO rejected the parents' position, explaining:

> Although the parents maintain that the student required intensive 1:1 instruction to receive educational benefits, there is nothing in the hearing record to suggest that the student would not be adequately supported by a 1:1 paraprofessional working under the direction of the special education teacher to provide support with the student's behaviors . . . . [T]he evidence does not support the conclusion that the student would require more than a 1:1 paraprofessional could provide within a 6:1:1 special class. Additionally, the May 2010 CSE recommended the provision of the following supports to address the student's behaviors and his social/emotional management needs: (1) clear and consistent routines; (2) positive reinforcement; (3) visual and verbal supports; (4) redirection; (5) prompting; and (6) modeling appropriate behavior.

(SRO Op. at 14 (internal citations omitted).) Having reversed both findings that favored the parents, the SRO did not reach the issues of whether the McCarton Center was an appropriate placement for the student or whether equitable considerations supported the parents' claims for reimbursement. (SRO Op. at 15.)

26

On June 1, 2012, the plaintiff filed a complaint in this Court.  The Complaint challenges the decision of the SRO and alleges violations of the IDEA, Section 504, and the New York State Education Law.  (See Compl. ¶¶ 72-77.) The plaintiffs moved for summary judgment on the IDEA claim and the defendant cross-moved for summary judgment on the same claim.

### III.

The plaintiffs allege that the Department violated the IDEA and demand reimbursement of D.B.'s tuition to the McCarton Center for the 2010-2011 school year.  The Supreme Court has established a two-part test to determine whether a party is entitled to reimbursement: (1) was the IEP proposed by the school district inadequate or inappropriate; and (2) was the private placement appropriate to the child's needs.  See Gagliardo II, 489 F.3d at 111-12 (citing Burlington, 471 U.S. at 370).  If the two-part Burlington test is satisfied, the Court has discretion to consider relevant equitable factors in fashioning relief.  Id. (citing Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 16 (1993)).  "Under New York's Education Law § 4404(1)(c), the local school board bears the initial

burden of establishing the validity of its plan at a due process hearing." R.E., 694 F.3d at 184.[14]

Under the first prong of the Burlington test, a court must determine whether the IEP was inadequate or inappropriate.  In making this determination, courts engage in a two-part inquiry "that is, first, procedural, and second, substantive." R.E., 694 F.3d at 190; see also D.C., 2013 WL 1234864, at *11.  The plaintiffs allege both procedural and substantive violations.

## 1. Procedural Adequacy of the IEP

"At the first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA." R.E., 694 F.3d at 190 (citation and internal quotation marks omitted). Procedural violations only entitle a parent to reimbursement "if they 'impeded the child's right to a [FAPE],' 'significantly

---

[14] The Supreme Court has left open the question whether the states could place that burden on the District, even in cases where a parent challenges the IEP.  See M.H., 685 F.3d at 225 n.3.  However, when a federal court reviews the administrative decisions reviewing the IEP, this Court is bound to exhibit deference to those decisions.  Id.  Nothing in this case turns on which party bore the burden of proof in the state administrative proceeding because that issue would only be relevant if the evidence were in equipoise.  Id.  That is not the case here.  See M.W., 2013 WL 3868594, at * 1 n.1 (declining to determine if parents or Department of Education bears burden of persuasion on adequacy of IEP because evidence was not in equipoise).

impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'"  Id. (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not."  Id. (citing Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005)); see also D.C., 2013 WL 1234864, at *11.

The plaintiffs allege that the Department violated the IDEA because the annual goals were not sufficiently detailed and did not contain specific evaluative criteria.  "[W]ith respect to the goals that must be included in any IEP, the IDEA and its regulations require that the IEP include short-term and long-term academic and non-academic goals for each student, as well as evaluative procedures for measuring a student's progress in achieving the short- and long-term goals contained in the IEP." M.H., 685 F.3d at 245 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(III); 34 C.F.R. § 300.320(a)(2)-(3); NYCRR tit. 8, § 200.4(d)(2)(ii)).

"[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative decisions." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003).  When an IEP contains a significant number of specific

29

short-term objectives to supplement otherwise broad annual
goals, the vagueness of the annual goals alone will not rise to
the level of the denial of a FAPE.  See, e.g., M.Z. v. N.Y.C.
Dep't of Educ., No. 12 Civ. 4111, 2013 WL 1314992, at *10
(S.D.N.Y. Mar. 21, 2013) (deferring to SRO decision that
specific short-term objectives remedied any deficiencies in the
annual goals); A.D. v. N.Y.C. Dep't of Educ., No. 12 Civ. 2673,
2013 WL 1155570, at *10-11 (S.D.N.Y. Mar. 19, 2013) (same).

        In this case, the SRO held that although the annual goals
were vaguely worded and lacked evaluative criteria, the
specificity and measurability of the 96 short-term objectives in
the IEP ameliorated any procedural violations that could have
flowed from the annual goals.  The SRO's decision is persuasive
and is entitled to deference.  See Grim, 346 F.3d at 381.  As
the SRO found, the annual goals in the IEP contain specific
short-term objectives with numerical targets for success.  Each
annual goal also indicates that there were would be three
progress reports per year.  (IEP at 6.1-6.14.)  Illustratively,
the annual goal that "[D.B.] will improve his reading skills,"
contains six detailed and measurable short-term objectives,
among them:

- D.B. will match at least 25 words to the co[r]responding
  pic[t]ures and vice versa with 80 % accuracy

30

- D.B. will receptively identify as a listener at least 25 written words, with 80% accuracy
- D.B. will match 15 words in different fonts with 90% accuracy
- D.B. will read 10 C-V-C (Consonant-Vowel-Consonant) words, with 80% accuracy.

(IEP at 6-1.) Similarly, the annual goal that D.B. "will improve visual perceptual and skills" includes five short-term objectives, among them:

- D.B. will match at least 25 different items/pictures that are associated with each other with 80% accuracy.
- D.B. will sort at least 5 related items/pictures from 10 different categories without a sample with 80% accuracy.

(IEP at 6-3.)  The annual goal that D.B. would "improve language skills for the classroom" contains thirteen specific measurable short-term objectives (IEP at 6-4) and the annual goal that D.B. would "improve play skills," contains seven specific measurable short-term objectives (IEP at 6-6).  These are only a few of the 17 annual goals and 96 specific and measurable short-term objectives in the IEP, but they demonstrate that the broad annual goals had complementary detailed short-term objectives with specific numerical targets.

Furthermore, the SRO held correctly that the failure to designate specific methods of measurement for the annual goals and short-term objectives in the IEP did not result in the

31

denial of a FAPE.  Many courts in this district have held that
similar omissions on the IEP do not impede the child's right to
a FAPE, significantly impede the parents' opportunity to
participate in the decision-making process, or cause a
deprivation of educational benefits.  See, e.g., J.A. v. N.Y.C.
Dep't of Educ., No. 10 Civ. 9056, 2012 WL 1075843, at *8
(S.D.N.Y. Mar. 28, 2012); W.T. v. Bd. of Educ. of the Sch. Dist.
of N.Y.C, 716 F. Supp. 2d 270, 288-89 (S.D.N.Y. 2010); R.R. ex
rel. M.R. v. Scarsdale Union Free Sch. Dist., 615 F. Supp. 2d
283, 295 (S.D.N.Y. 2009).  The numerical nature (80% accuracy,
match at least 25 words, etc.) of practically every short-term
objective in the IEP demonstrates that any perceived failure by
the CSE to specify a method of measurement did not deny D.B. a
FAPE.  See W.T., 716 F. Supp. 2d at 289 (affirming SRO finding
that vague annual goals offset by short-term objectives with
evaluative criteria such as "state the correct operation to be
used in each of 7 out of 10 word problems" or "write at least 8
of 10 sentences containing appropriate capitalization and
punctuation."); cf. M.H., 685 F.3d at 248-49 (upholding district
court decision that lack of specific methods of measurement was
a procedural violation because only fifteen of eighty short-term
objectives contained the measurement statement "teacher
observation" to indicate how an observer would measure progress

32

and none of the academic short-term objectives had any express evaluation procedure).

Finally, the annual goals and short-term objectives were all drafted and read out loud at the CSE meeting and there is no evidence that anyone objected at that time.  (Tr. 277, 304.) Therefore, any deficiencies in the annual goals did not impede the child's right to a FAPE, did not significantly impede the parents' opportunity to participate in the decision-making process, and did not cause a deprivation of educational benefits.  The decision of the SRO is affirmed.

## 2. Substantive Adequacy of the IEP

The plaintiff also alleges that contrary to the findings of SRO, the IEP was substantively deficient because the 6:1:1 ratio was insufficient to address D.B.'s unique educational needs. The defendant argues that the IEP was sufficient.  Because the designation of a 6:1:1 program with a 1:1 BMP was sufficient, the decision of the SRO is entitled to deference.

After determining whether a proposed IEP is procedurally adequate, "[c]ourts then examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits." R.E., 694 F.3d at 190 (internal citation and quotation marks

33

omitted).  It is clear that a school district is not required to "furnish . . . every special service necessary to maximize each handicapped child's potential," Rowley, 458 U.S. at 199, but rather "fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" Cerra, 427 F.3d at 195 (quoting Walczak, 142 F.3d at 130).  Thus, the education provided must be "sufficient to confer some educational benefit upon the handicapped child," Rowley, 458 U.S. at 200, but it need not "provide[ ] everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 132 (quotation omitted).

"[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." M.H., 685 F.3d at 244.  The reviewing court "must examine the record for 'objective evidence' that indicates 'whether the child is likely to make progress or regress under the proposed plan.'" Gagliardo II, 489 F.3d at 113 (quoting Walczak, 142 F.3d at 130).

At the outset, some of the material that was relied upon by the IHO and SRO was impermissible retrospective testimony.  In

34

determining whether the IEP was appropriate, "the IEP must be evaluated prospectively as of the time of its drafting," and "both parties are limited to discussing the placement and services specified in the written plan and therefore known to the parties at the time of the placement decision." R.E., 694 F.3d at 186-87. "[A] deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP," R.E., 694 F.3d at 185. And the converse is also true; a substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE.

At the due process hearing, Dr. Blaustein, Dr. Oratio, and Sharna McMicken each testified with respect to the inappropriateness of the 6:1:1 program for D.B. The IHO found that the IEP was inadequate, in part because of the testimony of Dr. Blaustein and Dr. Oratio. (IHO Op. at 15.) However, these witnesses were not at the CSE, did not submit exhibits to the CSE, did not examine D.B. prior to the CSE hearings, and their testimony should not be considered as a basis to declare the IEP

substantively inadequate.[15]  It would be inappropriate to allow
the plaintiffs to attack the IEP with retrospective testimony
while prohibiting the Department from retrospective bolstering.[16]
At oral argument on the present motions, both parties agreed
that the determination in this case should be based solely upon
on testimony of the witnesses and exhibits that were before the
CSE.  (Hr'g Tr. 6, 35-36, July 1, 2013.)

     The SRO's decision that the 6:1:1 ratio was sufficient for
D.B. to make progress is persuasive and entitled to deference.
The SRO relied largely on Ms. Kaufman's testimony, which the IHO
also found credible.  (See IHO Op. at 12.)  Ms. Kaufman
testified that the May 2010 CSE reviewed all the information
before it and received input from all of the student's current
educational providers.  (Tr. 260, 266-67.)  Based on the
information before it, the CSE concluded that a 6:1:1 program
with a 1:1 BMP would be "beneficial" for D.B. (Tr. 306-07), and
the CSE rejected a 12:1:1 program and a 6:1:1 without a 1:1 BMP
for D.B. because neither was adequate for D.B.'s needs (IEP at

---

[15] Similarly, although not explicitly listed as a ground for
finding the IEP inadequate, Dr. Oratio's October 2010
psychological evaluation was not before the CSE and should not
have been considered by the IHO or SRO.
[16] This is not to say that witnesses cannot explain the contents
of the IEP, which the Court of Appeals held is permissible.  See
R.E., 694 F.3d at 186 ("While testimony that materially alters
the written plan is not permitted, testimony may be received
that explains or justifies the services listed in the IEP.").

8).  Ms. Kaufman testified that it would not have been appropriate to consider anything more restrictive than 6:1:1. (Tr. 306.)  The SRO relied on this testimony and that decision is entitled to deference.

The plaintiffs have been unable to direct the Court to a single piece of evidence in the materials or testimony before the CSE which provided that D.B. required full time 1:1 instruction to make progress and could not succeed in a 6:1:1 program with the assistance of a 1:1 BMP.  The testimony and exhibits before the CSE indicated that D.B. required 1:1 support for his behavioral problems, occupational therapy, and speech and language therapy.  However, the IEP provided D.B. with 1:1 assistance to match each of these recommendations.  The IEP provided D.B. with a full time BMP.  It also provided DB with a plethora of 1:1 services for speech and language therapy, occupational therapy, physical therapy, and counseling.  (IEP at 9.1-9.2.)  The plaintiffs argue that D.B. requires 1:1 instruction and that a 1:1 BMP is insufficiently supportive of his needs.  However, "[t]he adequacy of 1:1 paraprofessional support as opposed to 1:1 teacher support is precisely the kind of educational policy judgment to which we owe the state deference if it is supported by sufficient evidence[.]"  R.E. 694 F.3d at 192.  As the SRO explained, "there is nothing in the

hearing record to suggest that the student would not be adequately supported by a 1:1 paraprofessional working under the direction of the special education teacher to provide support with the student's behaviors . . . ."  (SRO Op. at 14.)

The IHO's evidence to support his contrary conclusion is insufficient to overcome the deference owed to the SRO.  The IHO rested his conclusion that the IEP was substantively inappropriate on the testimony by Dr. Blaustein and Dr. Oratio, the testimony by Ms. Aranoff (Tr. 644), the 2009 report of Dr. Salsberg (Ex. 4), and the testimony by Ms. Visco, (Tr. 396). (See IHO Op. at 15.)  As explained, the IHO should not have considered the testimony of Dr. Blaustein or Dr. Oratio because neither were present at or submitted reports to the CSE, and neither had examined D.B. before the CSE hearing.  Furthermore, Ms. Aranoff did not testify that D.B. required full-time 1:1 instruction, but only 1:1 occupational therapy, which the IEP included.  (Tr. 644.)  The 2009 Salsberg evaluation was over a year old at the time of the 2010 CSE and the 2010 reports indicated that D.B. had made substantial progress over the 2009-2010 school year.  Moreover, although the Salsberg evaluation concluded that D.B. required a "small, structured ABA classroom setting" with "1:1 attention," (Ex. 4 at 4) the evaluation did not provide that D.B. could not succeed in a 6:1:1 classroom

38

with a 1:1 BMP.  Finally, although Ms. Visco's testified that
1:1 was "appropriate" and "necessary" for D.B. "in terms of both
skill acquisition and for problem behavior," she elaborated that
D.B. needed 1:1 because "it's just a safety concern with him,"
(Tr. 396) and therefore the CSE and the SRO were not wrong to
conclude that a 1:1 BMP combined with a 6:1:1 class would be
substantively adequate for D.B.

The SRO reasonably relied on Ms. Kaufman's testimony that
based on all the evidence before the CSE, the CSE concluded that
the 6:1:1 with a 1:1 BMP was appropriate, particularly in view
of the additional 1:1 services that were provided to D.B. in the
IEP.  The SRO weighed the evidence and concluded that the 6:1:1
with a 1:1 BMP was substantively adequate.  "Courts are ill-
equipped to choose 'between the views of conflicting experts on
a controversial issue of education policy[.]'"  Reyes v. N.Y.C
Dep't of Educ., No. 12 Civ. 2113, 2012 WL 6136493, at *6
(S.D.N.Y. Dec. 11, 2012) (quoting Grim, 346 F.3d at 383).
Accordingly, because the SRO's determination that the faculty-
student ratio in the IEP offered D.B. a FAPE was supported by
the evidence, the conclusion will not be disturbed.

**CONCLUSION**

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed, they are either moot or without merit.  For the reasons explained above, the defendant's motion for summary judgment on the IDEA claim is **granted**.  The plaintiffs' motion for summary judgment on the IDEA claim is **denied.  The Clerk is directed to close docket nos. 12 and 14.**

SO ORDERED.

Dated:  New York, New York
        September 14, 2013                        _____/s/_____
                                                         John G. Koeltl
                                              United States District Judge

40